430 P.2d 735

James BAXTER (deceased) and Sandra Sue
Baxter (widow), Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona
and J. H. Welsh & Son Contracting Co.,
Respondents.

No. 1 CA–IC 131.

Court of Appeals of Arizona.

July 26, 1967.

Rehearing Denied Sept. 1, 1967.
Review Denied Oct. 19, 1967.

Edward I. Kennedy, Tucson, and Edgar M. Delaney, Phoenix, for petitioner.

Robert K. Park, Chief Counsel, by Arthur B. Parsons, Phoenix, for respondent Industrial Commission of Arizona.

STEVENS, Judge.

Sandra Sue Baxter, widow of James Baxter, deceased, petitioned this Court for a writ of certiorari, which was granted, to review the award and findings of The Industrial Commission of Arizona. The award complained of denied death benefits to petitioner and her two minor children as the result of the death of James Baxter, their husband and father.

James Baxter suffered the initial industrial injury to his back in an industrial incident on 7 August 1956, when he was 22 years of age. Surgery was performed on 21 November 1956 for the removal of a disc. A second surgery, a spinal fusion, was performed in 1957. The third surgery, an exploration of the area with excision of further protruded intervertebrae disc material, was accomplished on 2 January 1959. Decedent returned to work in November 1959. He suffered continuing pain, which gradually increased in intensity. In April 1960 he suffered a second injury to his back in an industrial accident. The fourth surgery was performed on 2 November 1960, with excision of a traumatic fusiform neuroma at the first sacral nerve root.

In early 1962, decedent evidenced expressions of hostility toward one of the doc-

tors, Dr. Bishop, who was on a consulting board. He was examined by a psychiatric consultation board on 17 April 1962, and the board commented that should he resume his threatening attitudes towards surgeons who have attended him or others connected with The Industrial Commission, a sanity hearing might be indicated. Such a hearing was never held, and there is evidence later in the record that the decedent's attitude improved somewhat.

On 23 July 1962, the Commission issued an award and findings, pending determination of earning capacity, finding that the decedent sustained a 20 percent general physical functional disability, 15 percent related to the injury of 1956, and five percent related to the injury of 1960. The hearing to determine the amount of his loss of earning capacity was not held until over a year later, on 13 September 1963. The referee in charge of that hearing summarized the decedent's medical history as follows:

"After fifteen medical consultation boards, including one medical advisory board and two psychiatric advisory boards, four surgical procedures, and fourteen hospitalization periods, the Commission entered its findings and award and order pending determination of earning capacity * * *."

(It is noted that a third psychiatric consultation board examined the petitioner, following the issuance of the award and findings of 23 July 1962 and before the hearing of September 1963.)

The first witness at that hearing was Dr. John R. Green, who attended the decedent after the 1960 injury, and who had performed the fourth surgery. Dr. Green made a narrative description of the patient's medical history, which paralleled that given by the referee. Beginning with the incident of the fourth surgery, the doctor said,

"This neuroma was removed, and again temporary benefit occurred, but with increased activity the sciatica persisted.

"Because of this, he went through a period of prolonged physiotherapy under the direction of Dr. Swenson and his associates at the Orthopedic Clinic. He had follow-up X-ray studies, follow-up myelography. Because of the pain, considerable medication was necessary.

"We have pharmacy records indicating rather excessive use of percodan, empirin and codeine, all with the attempt to keep him comfortable so that he could work. With medications, he was able to work for a while.

"Finally he got to the point where he had inability to work because of the pain."

The decedent was present at the hearing, and testified describing his symptoms. He stated,

"Well, when I go seeking employment, I have to set for periods of time, and it gets quite painful. After setting for maybe an hour or an hour and a half, it is quite hard for me to get up and move.

"I have severe pain in the lower back and in the left leg. Usually the day after, I have great difficulty in getting out of bed because the pain is so severe."

When asked if he could perform a job that required him to be on his feet, he answered:

"On my feet or sitting down, it is the same experience. I mean, a couple of hours and I have to lay down because it is very severe. If I can lay down for a half an hour or so, like that, I can get back up and go after it again, as long as I don't over-do myself."

He testified that he was taking medication consisting of Darvon and Chloral hydrate. Counsel asked if he could drive a truck, and he answered that his physical condition limited his driving to slightly over an hour's duration at any one time. Decedent testified that on the Phoenix to Tucson trip he found he could only drive to Casa Grande. Counsel asked if he could drive further, and he answered:

"A  Yes. I mean, I could probably drive farther, but it wouldn't be safe to because my left leg is giving me

severe pain, and when you are in severe pain, I don't feel that it is safe to drive on the highway.

"Q I was going to inquire as to what convinced you you couldn't drive, or shouldn't drive, farther.

"A My left leg is in severe pain and it hurts quite bad, and it balls up on me. I get spasms in the calf of my leg and I wouldn't know when it would happen if I was driving."

The referee inquired of Dr. Green:

"Dr. Green, with that little bit of explanation as to a spasm in the left leg, could you express a medical opinion as to what causes that?

"DR. GREEN: That is his nerve roots irritation, and this was the basis of his 20 percent general disability.

"THE REFEREE: Would the description of the condition by Mr. Baxter indicate some damage of the nerve in that area?

"DR. GREEN: Yes. We know that it is damaged. We know that we were obliged to remove a portion of it which was made up of scar tissue and nerve fibers and what is known as neuroma. This was a pathological specimen which we have already studied and we know is accomplished.

"The problem is, if there were some way to get behind that point and to stop the pain, if the pain could be stopped, the spasms would stop. This was a consideration.

"This is what Dr. Swenson asked me about, and which I then sent up to the Commission as a hypothetical question.

"THE REFEREE: The removal of the scar tissue — the scar tissue around the nerve that goes to the left leg?

"DR. GREEN: The nerve root itself is approximately the size of a small pencil, and in his instance was about double that size with a little lump on it. This was because of being bruised and had hemorrhaged.

"At the last operation this had been peeled off, leaving a raw edge on the nerve, which we then packed with foam, gel foam we call it, hoping that it would seal itself over.

"THE REFEREE: That is, the scar tissue was removed from the nerve itself?

"DR. GREEN: That's right.

"THE REFEREE: Is that something which I, as a layman, would say that nature had put there to try to protect it?

"DR. GREEN: Actually, no. It was the direct result of injury, swelling, hemorrhage, and then piling up of scarring against the nerve. This is what the cause of it was. This is the result of an injury rather protecting it.

"THE REFEREE: Is it possible that the present cramping of the muscles in the calf of the left leg are caused by a re-formation of any scar tissue around that nerve?

"DR. GREEN: It is possible it is.

"THE REFEREE: How could that be determined medically?

"DR. GREEN: You can't determine it clinically. The only way you can determine it would be to re-explore, and you most certainly would find something there. He was getting along very well for awhile, and then as he got active he got into more and more trouble.

"Isn't that correct?

"THE WITNESS: Yes.

"DR. GREEN: So the $64 question is whether or not we just settle for this disability, this pain and spasms; or whether the risks of further procedures are justified.

"It has been the opinion of the larger consulting boards and the medical advisory board that, all things being considered, it would be unwise to proceed

with any further procedures because everyone so far has not agreed on that."

A suggestion that resulted from the hearing to determine loss of earning capacity was that the decedent receive rehabilitation training as a gunsmith, and the petitioner agreed that it was an area in which he was very much interested. The file indicates that between the hearing in September 1963 and the actual training which began 14 April 1964, the decedent was unable to find employment, and was continued on compensation. The training continued until 2 June 1964 when the trainer went on vacation. The training program was resumed 6 July 1964, and continued until 8 September 1964, when it was terminated by the trainer.

The trainer, in a letter to the Commission, gave several reasons for terminating the program. One was that the decedent's physical condition would not permit him to stand at a bench for any length of time. Other reasons given were his inability to cope with problems, his inability to repeat some of the simplest jobs one day after being instructed in the operation, and his mental attitude, which the trainer said disturbed everyone he came into contact with. The evidence shows that the decedent was highly perturbed at this termination of his training.

Throughout the training period there is evidence in the file that the decedent was requiring medication in large dosages. During the latter part of July and the first part of August of 1964 the decedent's physician reported to the Commission that the decedent was making frequent calls at his office requesting pain-relieving drugs.

19 November 1964 the decedent made application for readjustment or reopening of his claim. 30 November 1964, the Commission issued a findings and award for new, additional or previously undiscovered disability, with a finding that the decedent had sustained new, additional or previously undiscovered disability attributable to the injury of 1960, that he was then entitled to accident benefits from and after November

1964, that he was entitled to be reimbursed for medical expenses reasonably necessary to the reopening of his case, and that he required specialized neurosurgical treatment and ordered that the decedent be transferred to the care of Dr. John R. Green. The decedent had been seen by Dr. McGrath on 3 November 1964, and Dr. McGrath had recommended to the Commission that he could not find any psychiatric contraindications to further neurosurgical studies and/or treatment.

The decedent was admitted to the hospital on 20 January 1965, for lumbar sympathetic block, and possible sympathectomy. He developed influenza within the first 12 hours after admission, and was discharged within 24 hours after admission. He was subsequently hospitalized from 9 February 1965 until discharged on 15 February 1965. At that time a left lumbar sympathetic block was performed by Dr. John Ford. The report by Dr. John R. Green dated 22 February 1965 made this statement:

"Mr. Baxter had considerable back pain as a result of the procedure and also had no appreciable relief of the leg pain, coldness or sweating, complained of previously. On February 22, 1965, office examination indicates that the spasms in the leg have improved during the past week, that he has more back pain than he had previously and that the leg discomfort is not as bad now comparatively as the back pain. The left foot throbs intermittently and occasionally has shocklike sensations when he stands on the floor."

On 8 March 1965, Dr. Green reported:

"The sympathetic block was apparently not satisfactory entirely technically and Mr. Baxter had temporary genital numbness and inability to urinate adequately. This was temporary over a period of several days and subsided but is sufficient to make him concerned about the possibility of further lumbar sympathetic block. We have the alternative of direct lumbar sympathectomy on clinical grounds alone, further observation and further consultation. He will return in two weeks at

which time definitive recommendations should be possible.

The decedent was seen again by his physician on 23 March 1965, 7 April 1965, and 12 May 1965. In response to a request from the Commission for a detailed progress report, Dr. Green reported as follows on 11 May 1965:

"His progress is very unsatisfactory. He is complaining of chest pain, interscapular pain, left upper extremity pain, shortness of breath as well as low back pain and pain into the left lower extremity. He states that his daughter has streptococco pneumonia and that he has the same thing. He has been urged to go to his family physician, Dr. James Hurley, for immediate evaluation of the chest problem as a non-industrial situation. After he has recovered back to his previous status, I believe he should be seen as soon as possible by the medical advisory board. I have become almost certain in my own mind that it is not possible to rehabilitate him by any neurosurgical means and wish him to have the benefit of the consultation from the various members of the medical advisory board."

Dr. Hurley, who was treating the decedent's daughter for pneumonia, was also prescribing pain-relieving medication for decedent as his family doctor, in addition to that prescribed by Dr. Green. Neither doctor was aware of the dual medication. Dr. Hurley testified that he had been varying the prescription medication in an attempt to find something that would relieve the decedent's pain without causing the side effect of nausea which decedent complained of with Darvon. He stated that on the evening of 19 May 1965, at the request of decedent's wife, he gave the decedent a prescription for 40 capsules of Cephalgesic. He described this medication as a short-acting phenobarbitol-type drug. He indicated that decedent was advised to take two capsules every four hours as needed for pain.

The decedent's wife testified that when she returned home from visiting the couple's daughter at the hospital at 7:30 p. m. on 19 May 1965, the decedent had taken two of the Cephalgesic capsules. She stated that she and the decedent had stayed up until 1:00 a. m., and that decedent took two "nerve pills" and two more Cephalgesic capsules at bedtime.

20 May 1965, the decedent was observed by a deputy sheriff doing 60 miles per hour in a 25 miles per hour zone in Guadalupe, Arizona. The Sheriff's deputy pursued the decedent's car and attempted to stop him. The decedent refused to yield even though the deputy sheriff had his red light flashing and his siren sounding. The deputy radioed ahead for help and other deputy sheriffs set up roadblocks with their patrol cars at two places as decedent was approaching. The decedent went around both roadblocks, and proceeded into Chandler, Arizona, where he was stopped by a roadblock established by the Chandler city police. The deputy sheriff who had pursued him testified that he got out of his patrol car and started towards the decedent's car to ask him for his driver's license. He approached the vehicle from the left side. As he approached the automobile the decedent pulled a gun and pointed it at the deputy sheriff. The deputy testified that he pulled his gun and ordered the decedent to drop the gun he held. He stated that he repeated the order two or three times but the decedent refused to obey the command. At this point a second deputy ordered the decedent to drop the gun. The decedent said, "Watch it, I can take care of all of you." The second deputy testified that he could see that the decedent's gun was cocked and ready for firing. At this point the second deputy shot the decedent through the neck, killing him.

The decedent's wife testified that later in the morning when she was notified of her husband's death, she thought at once of the Cephalgesic capsules and checked the bottle. At that time there were 24 of the capsules left.

The decedent's wife made application on behalf of herself and her two minor children for death benefits, alleging that the decedent's death occurred as a direct result of the industrial incident. The Commission found that, "James Baxter's death on May 20, 1965, was not the result of his injury by accident of August 7, 1956, nor the accident of April 8, 1960". The question before this Court is whether the award and findings of the Commission which denied death benefits to the widow and children, and found that the decedent's death was not related to the industrial incident, is reasonably supported by the evidence.

A formal hearing was held on the widow's petition for death benefits. The widow testified that prior to the industrial accident her husband had a pleasant personality. She said:

"Well, he was a very easy person to get along with. He was even tempered. I don't think I ever saw him get mad. Just in general and everything, he had a very even disposition and everybody liked him and he got along with everybody."

The widow was asked:

"Q Did he have any trouble with the police, any police record of any kind?

"A No.

"Q How did he get along with children?

"A Well, in my opinion, I think he was one of the best fathers that ever was. I mean he was always good with them, and when we went any place we always took them with us and his first thought was of them."

*    *    *    *    *    *

"Q Following his industrial accident of August 1956, did you notice any change in his temperament?

"A Well, yes, I did. He got so that he was moody where he wasn't before, and he didn't seem to want to associate with people that had been our friends, and started staying more and more to himself. About the only thing he would do at all,

we would go out to target practice on the desert and stuff, but as far as going any place or visiting other people or anything, he got so he just didn't want to.

"Q Did this affect your home life at all?

"A Well, yes, it did, because I think that everybody likes to have friends."

The widow testified that the decedent did have problems with reactions to some of the drugs that he took over the eight-year period following his first industrial accident. She stated that some of the drugs would have to be changed because they made him nauseated, and that a lot of the drugs that he took on a trial basis if he got the least effect would also make him very nauseated. She testified that he had constant pain during these eight years. She also testified that that at times he had unusual reactions to some of the drugs that he took. She stated that at one time she called one of the doctors, Dr. Swenson, and requested him to take the decedent off one of the medications he had been taking because it was very noticeable that after he took the drug he became belligerent. She testified that at one period of time right after the 1960 injury, when the couple had two children, a son and a daughter, that it was almost impossible for her to live with the decedent. At that time she told him that unless he straightened up, that is, unless he could change his attitude which was that everyone was his enemy, she would leave him for the sake of herself and the children. He had just had his prescription (type of medicine unidentified) refilled the day before, and his widow stated that he took all of the pills available in that prescription and tried to commit suicide. She stated that she called Dr. Swenson on that occasion and told him what had happened and that it took her two days to "pull him out of it that time". She did not take him to the hospital. Shortly after this attempted suicide, in July or August of 1961, he put one of his guns to her head

and threatened her, giving as the reason the fact that she was working when he could not. She said, with regard to the working, "I had to make ends meet, but there was something there that—well, he just didn't have the understanding that he had had before". The widow testified about the terrible and constant pain her husband suffered:

"Q Was he able to stop taking drugs when he wanted to?

"A Yes, he was. I mean with the understanding that when he stopped taking them he was in a great deal of pain. I mean there is some things that you can put on and some you can't. And, like I said, when you get up on the average of half a dozen times a night and stamp cramps out of your leg, which of course in this instance was in his left leg that the operations and the injury to his back had caused damage, and I mean the pain was there, there is no getting around it."

She was asked to describe his condition during April and May 1965 just prior to Mr. Baxter's death. She testified:

"A Well, in my opinion, again, he was worse. As far as his attitude toward me with our daughter in the hospital and everything, that was a little bit more understanding. I mean he was easier for me to get along with. But as far as his mental or physical attitude, say towards this other operation and one thing and another, he was mentally I would say, worse. I believe at this time is one of the times that he made the statement to me that if he had to keep living like that, he didn't want to live."

She was asked by counsel to describe Mr. Baxter's driving habits, and she answered:

"A He was a very safe and compatible driver. He was always careful and never had any accidents, either his fault or anybody else's. If he felt that he had—oh, we'll say, taken too much medication or something, he usually let me drive. And as far as being a fast driver, it had been quite a while, I think he had got his last speeding ticket for maybe over ten miles over the speed limit, it wasn't—

"Q When was that?

"A Oh, goodness, I would say that it would have been at least a year or better."

She also testified about the decedent's surgery in February of 1965, as follows:

"Q Is this the time he had this left lumbar symphathectomy?

"A Yes, it is.

"Q How did he get along after that event?

"A Well, he was very upset about it.

"Q Why was that?

"A Well, he had about all the operations and all that he could take, they hadn't seemed to do him any good and he was very overwrought about it. When he was in the hospital, he was in for about a week or so and he lost so much weight and they had decided that it would be a few days before they would make their actual decision on just what they were going to do, and so I took him home one Sunday just for the day and took him back Sunday night, and I'd never seen him afraid before, he didn't have that kind of a temperament, and when we walked into that room that night and there was a tray there with all of the needles and everything on it that looked as they were to be used for him, he was the only one in the room, and I thought he was going to collapse, he just shook all over, he just couldn't take it."

"Q Was any further surgery suggested at this time?

"A Yes, Dr. Green talked to both my husband and myself about it and said that he couldn't say that it

would positively make him so that he would be all right. I mean he couldn't say that there was even hardly a fifty-fifty chance that it would, and it was just one of those things that he felt it would—or might—I should say, might stand a chance of healing him. But it upset Jim very bad because he had gone through so much already.

"And as Dr. Green explained it, there would be a chance that he would have to learn to use his left leg all over again. I mean almost practically learn to walk all over again, and without the assurance that it would be a complete success, he was just terrible upset about it."

She stated that this conversation took place with Dr. Green just a few weeks before the death of the decedent. She also stated that her husband had on many occasions made the statement to her that, "if he had to live in the condition and everything that he was in, that he just could not."

The family physician, Dr. James M. Hurley, also testified at the hearing. He said that he first saw the decedent on 31 March 1964. Dr. Hurley found him to have a tenderness over the left sacroiliac, in the lumbosacroiliac joint, and along the left sciatic nerve with weakness of his left leg and diminished reflexes. Most of the involvement was in his left leg. His complaints at the time were pain, and the reason that he had gone to Dr. Hurley was to get a renewal of a prescription for a pain-killing drug. The Doctor said his treatment of the decedent was merely symptomatic, and that he prescribed both pain-relieving and muscle-relaxant type drugs in an attempt to make him comfortable. Dr. Hurley was asked:

"Q At the time of your initial examination of Mr. Baxter, did you find any physical findings of organic disability?

"A Yes. Those that I stated.

"Q Did he also have functional problems?

"A Yes, I think to a certain degree he had functional problems. He complained of continuous pain, which was only relieved by the Darvon compound, and then for short periods of time. He stated that he was presently going through a rehabilitation program and was doing gun-smithing, but complained that he was sitting on a stool most of the time doing this work at a bench and that he could only sit for relatively short periods of time.

On the basis of his examination I felt that this was a reasonable complaint because any pressure over the sciatic nerve, either at the base or on down the length of the nerve, seemed to cause him pain, and it didn't seem to be in any other area.

"Q Was there any question in your mind that he did have some organic problems as well as functional problems?

"A Oh, there is no question in my mind, even on the basis of his previous surgery, I felt sure that he must have some organic problems. The exact nature or extent of which I really didn't know except by history. I gave the history of a neuroma being excised on at least one occasion and apparent recurrence of the same condition, and on this basis I felt that certainly his complaints were reasonable, but I didn't feel that he was accomplishing anything by taking medication and continuing to suffer the pain.

"Q Is is correct, Doctor, that your treatment was mainly at alleviating his symptoms?

"A Correct; plus an attempt to get something definitive done."

Dr. Hurley was examined with regard to the amount and type of drug prescriptions that decedent was taking shortly before his death. He testified that he had no knowledge that both he and Dr. Green

were prescribing for the decedent simultaneously. He did state that the pharmacists at one of the drug stores had called his attention to the prescriptions which the decedent was having filled at that pharmacy, and that the Doctor and pharmacist went over these together. He said that although decedent was getting more drugs than the Doctor felt he should be getting, it was not to the extent that it was an uncontrollable type of thing although the Doctor did feel that decedent was habituated to the drugs. He was asked:

"Q Would you consider that amount of drugs over that period a reasonable amount of drugs for his condition?

"A No.

"Q Do you feel that it is an excessive amount of drugs?

"A It's very definitely an excessive amount of drugs.

He was also asked:

"Q Did you feel that Mr. Baxter had emotional problems related to his pain?

"A Definitely."

Two psychiatrists testified at the hearing as to the causal relationship between the decedent's industrial injury and his subsequent death. The first psychiatrist to testify was Dr. Maier I. Tuchler. He had never seen or examined decedent, and testified from an examination of the medical file and record. Dr. Tuchler advanced a theory of unconscious suicide with regard to the decedent's death. He was questioned and answered as follows:

"Q Doctor, based upon the facts given you in your complete review of the medical file, do you have an opinion as to whether there was any relationship between Mr. Baxter's 1956 and 1960 industrial injuries and his untimely death on May 20, 1965?

"A Yes, I have an opinion.

"Q Would you please relate that opinion and the reasons therefor?

"A I believe there is a tragic relationship between the first injury and the subsequent injury and multiple surgery, involving two areas. We certainly have a personality trait disturbance, a characterological disturbance with paranoid tendencies, featuring emotional instability, excessive hostility, an occasionally threatening attitude and behavior, which bears distinct relationship to his industrial disability, not just to the disability per se, but to the period of time that he has struggled with it.

"Secondly, based on the record antecedent to any 14 or 16 pills, (this is a reference to the Cephalgesic capsules which were discovered missing from the decedent's prescription on the morning of his death) there is unquestionably a problem of addiction, and this additional problem was severe. In any person who takes 5 or 6 Darvon tablets a day, and this is before any of the Cephalgesic or change of medication was involved, and 2 seven and one half grains of chloral hydrate three times a day, according to the record, and Equanil, three or four a day, dependency on drugs is well established, which is, incidentally, closely related to the personality trait disturbance, frequently utilizing drugs as a means of gaining equanimity.

*    *    *    *    *    *

"Q Doctor, would you say that the psychiatric problem and the character disorder were, in your opinion, related to his industrial injuries?

"A Here is a difficult question to answer. We cannot say that an industrial injury causes character disorder directly. We must accept psychiatric concepts that the character of personality disorder was the type of personality that was preexistent but flared up as the result

of injury only to the extent that the injury forced him to have to face multiple surgery for the relief of pain; that the injuries and the surgeries did precipitate and blow up the simmering resentment that he felt toward his doctors, and several of them he felt real resentful toward.

"He couldn't get a guarantee, incidentally, from Dr. Green—I believe that is in the record—and therefore, felt that nothing could be done for him."

Dr. William B. McGrath testified at a later hearing. Dr. McGrath had examined and treated decedent on several different occasions during his eight years of illness following his first industrial injury. He was also a member of several of the psychiatric consultation boards that evaluated the decedent's condition. Dr. McGrath disagreed with Dr. Tuchler's theory of unconscious suicide, stating that this was not a scientific theory. He testified:

"A Well, the theory of unconscious suicide is not scientific; it is not subject to proof or disproof, and in my opinion, it does not fit the character structure of Mr. Baxter as we have observed it, and, secondly, I felt that there were much more propelling theories for the whole incident, theories in which there was some basis in evidence in the medical file instead of pure speculation such as that of unconscious suicide.

"Q From a scientific standpoint, what would be the most probable explanation?

"A From my experience with Mr. Baxter and experience of others and from material in the file, I felt that this was in connection with Mr. Baxter a display of that sham aggression and emphasis is on the word 'sham' which I mentioned earlier.

"Do you want me to elaborate?

"Q Yes, in what respect?

"A I did not feel Mr. Baxter was genuinely aggressive and dangerous; on the other hand, the officers had no way of knowing this. I felt Mr. Baxter habitually used a mechanism of apparently or posturingly menacing behavior whenever he was in circumstances where he might be intimidated, and behind that also as a compensation for his feelings of inadequacy and inferiority.

"This is a very common mechanism. It occurs both in animals and humans, the so called 'sham rage', which is simply a person's mechanism of 'I will be the first threatening one, but I don't really mean it.' "

After a lengthy period of examination and cross-examination, Dr. McGrath's testimony was finally summarized as follows:

"MR. KENNEDY:

"Q Let's go back and elaborate. You agree, Doctor, before that (before the first industrial injury) this man had a basic personality deficiency; will you agree with those terms?

"A Yes.

"Q I think, is it not so, if life had not (sic) gone on more smoothly than it had in view of his accident and disability, it is likely possible that he would never have had gross or serious personality problems that require treatment?

"A That's true.

"Q However, he did have at least a physical trauma in the nature of an industrial injury?

"A Yes.

"Q I think you also testified the initial physical trauma, the subsequent medical treatment, the surgery, the pain, all the other factors that went into this incident and subsequent thereto, constituted and taken together collectively constituted whatever you choose to call it, a disruption * * * a disruption of his

personality which had, prior to the accident, stabilized itself?

"A That is correct."

■ We have stated: "The Court of Appeals will not substitute its opinion for that of the Industrial Commission where the Commission has resolved a conflict in medical testimony." Smiles v. Industrial Commission, 2 Ariz.App. 167, 406 P.2d 885 (1965). Here, however, we find no conflict in the medical testimony as it relates to legal causation. Dr. Tuchler gave as his opinion, based upon the medical facts present in the record, that the decedent committed unconscious suicide by putting himself in the position where it was most likely he would be killed. It was his opinion that this act was the result of the industrial injury, the surgical procedures and the pain and suffering and excessive use of drugs during the eight years between decedent's accidental injury and his death. Dr. McGrath discounted the theory of unconscious suicide, but testified that the decedent's action in drawing a loaded pistol and pointing it at the deputy sheriff was a manifestation of sham aggression which was a part of his personality disorder. This personality disorder or disruption, the Doctor testified, would not have occurred but for the industrial injury and the subsequent medical treatment, surgery, excessive use of drugs, and pain.

■ The Commission argues in its brief that the Commission as trier of fact is not bound to accept any of the psychiatric testimony, stating, "No Arizona case has been found which seems directly in point * * *". The Supreme Court stated in Cammeron v. Industrial Commission, 98 Ariz. 366, 405 P.2d 802 (1965): "When medical opinions, based on matters peculiarly within the realm of scientific knowledge are uncontroverted, as in the instant case, such opinions cannot be arbitrarily rejected by the Commission (citations omitted)". In the Cammeron case, as in the instant case, the medical opinions to which the Court made reference were those given by psychiatrists. We cannot sustain this argument by the Commission.

The Supreme Court also said:

"Since the Commission when sitting as trier of fact must apply the same fundamental principles of law and equity as a court or jury, it may not arbitrarily disregard the only reasonable inference which can be drawn from the uncontradicted testimony." Ratley v. Industrial Commission, 74 Ariz. 347, 248 P.2d 997 (1952); Simpkins v. State Banking Department, 45 Ariz. 186, 42 P.2d 47 (1935).

The medical evidence given by both psychiatrists and fortified by the testimony of the neurosurgeon and family physician, and by the reports contained in the eight-part Commission file, clearly shows an unbroken chain of causal relationship stemming from the accident of 1956, to the decedent's death. This chain is forged from the injuries in 1956 and in 1960, from the four surgeries, from the pain, from the excessive use of drugs, from the failure of the rehabilitation program, from the failure of the surgical attempt to relieve pain together with its frightening side effects, from the observation of the neurosurgeon that no guarantee of success could be given for any surgical relief of pain; and these links brought the decedent, after eight years of terrible pain and suffering, to that place and that time where—either because of an unconscious wish to commit suicide or because of his sham aggression—he pointed a loaded gun at an officer of the law and was shot and killed.

■ Legal causation does not contemplate that the injury be the sole cause of the death. It is sufficient to satisfy the requirements of legal causation that the injury, working upon an existing bodily condition or predisposition, produce a further injurious result. Murray v. Industrial Commission, 87 Ariz. 190, 349 P.2d 627 (1960). Here the personality disturbance arose from influences and factors which had affected the decedent and moulded the formation of his personality from infancy,

but the medical evidence shows that it would not have manifested itself but for the industrial accident, injury, and subsequent treatment and related events. We have stated that the employer takes his employee as he finds him, Intern. Metal Products, Div. of McGraw Edison Co. v. Industrial Commission, 2 Ariz.App. 399, 409 P.2d 319 (1965).

Although the death in the case at bar did not technically result from suicide, the fact situation makes it analogous to the cases which discuss suicide and attempted suicide, in that there was an intervening act between the injury and the death. Our Supreme Court in Graver Tank Mfg. Co. v. Industrial Commission, 97 Ariz. 256, 399 P. 2d 664 (1965), quoted with approval the Florida court in Whitehead v. Keene Roofing Co., 43 So.2d 464, 465 (Fla.1949):

" '(w)hile it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an *act* intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a *cause* intervening between the injury and death.' " 97 Ariz. 256, 261, 399 P.2d 664 (1965)

■ The only inference that can be drawn from the uncontradicted testimony is that the decedent's death was causally related to the industrial accidents of 1956 and 1960. The award is set aside.

CAMERON, C. J., and DONOFRIO, J., concur.